John J. Dillon, S.
The subject matter of this discovery proceeding is a sum of money deposited in two savings accounts and claimed to have been the property of the decedent who died intestate on October 27, 1959. The decedent’s wife had died previously on August 22, 1954. At the time of her death a pocketbook containing “ about $12,000 ” was found beside her pillow. Although there has been some dispute in the past about whether the money belonged to the husband or the wife, it is now generally agreed that it was the property of the husband, the present decedent, and represented his life savings. Several days after the wife’s death the money was counted and found to amount to $11,437.28. The decedent turned it over to his son Frank, who proceeded to deposit it in two savings accounts. One account was opened in the Yonkers Savings Bank in the name of “ Leo Dziadzio in trust for Frank D. Dziadzio,” in the sum of $5,737.28. The other was in the People’s Savings Bank in the name of “ Frank D. Dziadzio or (father) Leo Dziadzio as Joint Tenants,” and the amount deposited was $5,700.
The petitioner in this proceeding is the decedent’s son Walter, to whom letters of administration were issued on January 19, 1960. The respondents are the son Frank, his wife Paula, the decedent’s daughter Stephanie Maffei and the latter’s husband. They claim title to the funds as the result of alleged gifts made *126 to them by the decedent, either in August, 1954 or at some subsequent date.
Frank Dziadzio appears to claim that the entire fund was given to bim by his father on August 26, 1954, immediately following the death of the mother. It is clear that there could have been no present gift of the moneys deposited in the Yonkers Savings Bank because the account was in such form that Frank Dziadzio could not draw upon it, and Frank testified that although he held the passbook his father could have gotten it at any time. On May 14, 1959 this account was changed to a joint account, apparently upon a written authorization from the decedent, but the court is not satisfied that on that date the decedent had sufficient mentality to understand the nature and effect of his act.
At the time of his wife’s death in 1954 Leo Dziadzio was seriously incapacitated as the result of an automobile accident. He was never able to work thereafter. Eventually he became afflicted mentally. In April, 1959 he was committed by the Westchester County Court to the Harlem Valley State Hospital. The diagnosis at Grasslands Hospital, where he spent about eight days prior to his removal to Harlem Valley, was chronic brain syndrome due to arteriosclerosis. This was only a month before he authorized the Yonkers Savings Bank to change the account from a trust to a joint account. A psychiatrist who had personally examined the decedent at Grasslands was of the opinion that he did not know the nature and quality of his act when he signed the withdrawal slip on May 14, 1959. That testimony is strongly supported by the evidence of several witnesses that immediately following the transfer of the account the decedent was emphatically insisting that the money was his own.
The account in the People’s Savings Bank was a joint account from the beginning, but the court is of the opinion that the form of the account in the other bank negatives the entire claim that a gift of the whole fund was made to the son Frank in August, 1954. The court concludes that the purpose of the joint account in the People’s Savings Bank was not to effect a gift to the son, but to enable the latter to make withdrawals for the father’s benefit. The son did in fact make withdrawals from this account from time to time for the purpose of paying his father’s medical, hospital and other bills. On May 18, 1959, while his father was still living, Frank Dziadzio withdrew the entire balance from this account and placed it in a new account in the names of himself and his wife. By that action he eliminated the conclusive presumption which would otherwise have *127 arisen in favor of the survivor as provided in section 239 of the Banking Law. (Marrow v. Moskowitz, 255 N. Y. 219.) It thus became competent for the petitioner to show that the apparent joint tenancy was not a joint tenancy at all. (Matter of Ricisak, 2 Misc 2d 717.)
These parties were not dealing with each other on an equal basis. The father was a person of limited education, and at the time of the transactions in question he was elderly and in broken health. The son was young and vigorous. The disparity between them requires the conclusion that the father reposed confidence in the son, and the latter how has the burden of showing affirmatively ‘ ‘ that no deception had been practiced, no undue influence had been employed and that everything was fair, open, voluntary and well understood.” (Arakjinjian v. Arakian, 268 App. Div. 41, 44.) That burden has not been sustained. There is no satisfactory proof that the decedent was ever aware of the form of the savings accounts opened by the son, or of the subsequent transfers by means of which he was stripped of every dollar while still living. He was almost certainly incompetent in May, 1959, when he signed the withdrawal slip which enabled the son to take possession of the funds in the Yonkers Savings Bank. There is no evidence that he was incompetent in 1954, when the joint account in the People’s Savings Bank was opened, but it is most unlikely that he knew that the son could at any time take possession of the entire deposit, as he subsequently did. The claim of a gift is contrary to all the probabilities. It is incredible that this man would have knowingly impoverished himself in the face of the fact that his earning "power was gone.
The funds in question must, therefore, be restored to the estate. The amount with which the respondents are chargeable is the following: (1) the amount of $5,737.28 deposited in the Yonkers Savings Bank, Avith interest from August 26, 1954 to date, computed at the rate or rates paid by the bank; and (2) the amount of $5,700 deposited in the People’s Savings Bank, less the withdraAvals for the decedent’s benefit as shown in respondents’ Exhibit A, with interest on the balances from August 27, 1954 to date computed at the rate or rates paid by the bank.